**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| THE GATEWAY LOGISTICS GROUP, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. H-05-2742 |
| DANGEROUS GOODS MANAGEMENT AUSTRALIA PTY, LTD, *et al.,* | § § § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

The Gateway Logistics Group, a Texas company with its principal place of business in Houston, sued Dangerous Goods Management Australia Pty, Ltd. ("DGM"), an Australian company with its principal place of business in New South Wales, Australia; Cridlands Pty, Ltd., an Australian law firm; and individual defendants Jimmy St. Ledger and Tracy Reeves, each of whom is an Australian resident.  Gateway filed the suit in Texas state court and asserted state-court causes of action for libel *per quod*, libel *per se*, tortious interference with existing and prospective business relations, business disparagement, breach of contract, and breach of the duty of good faith and fair dealing.  (Docket Entry No. 1).  The defendants removed on the basis of diversity and filed motions to dismiss for lack of personal jurisdiction.  (Docket Entry Nos. 4, 6).  Gateway responded, claiming that this court has jurisdiction over the defendants and moving in the alternative for jurisdictional discovery.

(Docket Entry No. 13).  The defendants replied.  (Docket Entry Nos. 16, 18).  This court permitted limited jurisdictional discovery.  (Docket Entry No. 19).  Gateway has supplemented the record to include the results of that discovery, (Docket Entry No. 20), and DGM and Cridlands have responded, (Docket Entry Nos. 21, 22).  Based on a careful review of the motion and responses, the record, and the applicable law, this court grants the motions to dismiss filed by St. Ledger, Cridlands, and Reeves, and denies DGM's motion to dismiss. The reasons for these decisions are explained below.

## I.    Background

Gateway is a Texas company that provides logistical services for the shipping and transportation industry.  DGM provides services relating to packaging and transporting dangerous goods and hazardous substances.  On August 20, 2005, Gateway and DGM entered into a Joint Venture Agreement to provide services for transporting a form of aluminum waste known as "Spent Pot Lining" ("SPL") for Tomago Aluminum Company, an Australian smelting company.

The Joint Venture Agreement did not call for performance in Texas.  Instead, the agreement required Gateway and DGM to provide Tomago with logistical, stevedoring, and shipping services to move the dangerous SPL safely from Port of Newcastle, Australia to a disposal point in Italy.  The Joint Venture Agreement called for Gateway and DGM to divide the duties and profits arising out of the agreement evenly.

The Joint Venture Agreement included a choice-of-law provision stating, "This Deed shall be governed and construed in accordance with the laws of the State of Texas, United

States of America." (Docket Entry No. 5, Ex. 2-A, ¶ 12.7).  The Agreement also included

an arbitration/forum-selection provision that read as follows:

> Notwithstanding anything contained herein, if the Participants are unable to
> resolve a dispute, controversy, claim or difference arising under the Deed, then
> such dispute, controversy, claim or difference shall be settled by binding
> arbitration in Houston, Texas, United States of America before an independent
> and impartial arbitrator.  Any party may call for arbitration by written notice
> to the other.  If within twenty (20) days after receipt of such notice, the parties
> are unable to agree upon an arbitrator, then any party may apply to the then
> sitting Chief Judge of the United States District Court for the Southern District
> of Texas requesting the appointment of an arbitrator.  The arbitration shall be
> governed by the United States Arbitration Act (9 U.S.C. Sections 1–16) and,
> except as contradicted by the United States Arbitration Act, shall be conducted
> in accordance with the rules of the American Arbitration Association then in
> effect, including, without limitation, the Code of Ethics for Arbitrators in
> Commercial Disputes.  The decision of the arbitrator on any point or points
> will be final.  Judgment may be entered upon any award rendered by the
> arbitrator in any court having jurisdiction.  Each participant shall pay its own
> costs of the arbitration, including attorneys' fees, preparation costs and travel
> expenses.  All other costs of arbitration, including the cost of the arbitrator,
> shall be borne equally by the parties.

(*Id.* at ¶ 12.8).

This Joint Venture Agreement was DGM's first and only contract with a Texas

company or individual.  (Docket Entry No. 5, Ex. 2, ¶ 6).  DGM has no employees or agents

in Texas, does not own or lease  property in Texas, does not advertise or solicit business in

Texas, does not have a relationship with any financial institution in Texas, and has never

applied for or maintained licenses or permits from any local, state, or federal authority in

Texas.  (*Id.* at ¶¶ 7–12).

Jimmy St. Ledger is an Australia resident who works for DGM.  St. Ledger executed

the Joint Venture Agreement with Gateway on behalf of DGM.  Although St. Ledger signed

the agreement in Houston, Texas, (Docket Entry No. 5, Ex. 3, ¶ 3), all of Gateway's other actions and communications with respect to negotiating the agreement took place in and from Australia. (*Id.*). St. Ledger does not have an office, mailing address, or telephone number in Texas; has never owned or leased land in Texas; has never advertised or solicited business in Texas; has no bank accounts or other financial dealings with Texas institutions; and has not applied for or maintained licenses or permits from any local, state, or federal authority in Texas. (*Id.* at ¶¶ 5–9).

Tracy Reeves is an attorney practicing law with Cridlands Pty., Ltd. Reeves resides in Darwin, Northern Territory, Australia. She has never been to Texas for business purposes, is not licensed to practice law or conduct business in Texas, and has not entered into any contract with a Texas resident. (Docket Entry No. 6, Ex. 1, ¶¶ 10–13). Reeves does not advertise or solicit business in Texas, does not own or lease any land in Texas, and has no bank account in Texas. (*Id.* at ¶¶ 6–9).

Cridlands Pty, Ltd. is an Australian law firm with offices in Darwin and Sydney. (Docket Entry No. 6, Ex. 2, ¶ 1). Cridlands does not maintain a place of business in Texas, has no employees in Texas, has not entered into any contracts with Texas residents, does not own or lease any land in Texas, does not maintain any bank accounts in Texas, and has not engaged in litigation in Texas courts. (*Id.* at ¶¶ 2–8). Cridlands has provided legal services to Texas companies in the past, but has done so only with respect to those companies' Australia business dealings. (*Id.* at ¶ 5). Cridlands does no business in Texas, has no business or legal partnerships in Texas, and has never advertised or solicited any business

4

in Texas.

The parties' dispute arose when Tomago hired Gateway and DGM to transport SPL from the Port of Newcastle, Australia to Porto Margera, Italy. (Docket Entry No. 1, ¶ 8). Under the Joint Venture Agreement, Gateway sought a suitable vessel for shipping the SPL. Gateway hired BBC Chartering & Logistics, a German company, to obtain the vessels. On September 21, 2004, the SPL was loaded onto the "BBC Campana" at the Port of Newcastle and shipped to Porto Margera, Italy. On November 28, 2004, the "BBC Ontario" was loaded with SPL at the Port of Newcastle and transported to the same destination. The only stop on either voyage was a single fuel stop in Singapore.

On February 8, 2004, BBC Chartering & Logistics obtained a third vessel, the *M/V Marlene Green*, to ship additional SPL from the Port of Newcastle to Porto Margera, Italy. Gateway alleges that shortly thereafter, DGM, DGM employee Jimmy St. Ledger, Cridlands attorney Tracy Reeves, and Cridlands (DGM's law firm), relayed misinformation about Gateway to its client, Tomago. Gateway alleges that the defendants told Tomago representatives in person and through email correspondence that Gateway intended to ship additional cargo along with Tomago's SPL and planned to make numerous stops en route to the final destination. Shipping SPL, which is a hazardous substance, is highly regulated; Tomago holds a hazardous materials export license from the Australian government. Regulations governing SPL shipments forbid shipping SPL with other cargo or in vessels that will make more stops than are necessary for fueling. Violations of these regulations could expose Tomago to substantial penalties.

5

In this lawsuit, Gateway alleges that the first defamatory communication was a March 2, 2005 email sent by Geoff Beasley of Newcastle Stevedores to St. Ledger. Beasley forwarded St. Ledger an email originating from a third-party shipping company called Asiaworld Shipping Services. The forwarded email contained a Gateway-authorized stowage plan indicating that additional cargo would be loaded onto the *Marlene Green* and that it would stop at other ports of call during the voyage to Italy. St. Ledger also forwarded the email to Jason Pitcock, Gateway's project manager. Pitcock recognized the potential problems for Gateway and asked St. Ledger for additional information.

Gateway alleges that DGM refused to provide further information at that time and instead told Tomago that Gateway intended to allow additional cargo on the SPL shipment and also intended to make multiple stops on the trip. Gateway alleges that these statements were false and made with the intent of prompting Tomago to fire Gateway and award all the SPL shipping business to DGM. (Docket Entry No. 1, ¶ 12).

DGM did, however, respond to Gateway's inquiry before the *Marlene Green* left for Italy. On March 10, 2005, eight days before the vessel was to be loaded, Tracy Reeves, an attorney at Cridlands, sent a letter to Pitcock at Gateway reciting the possible problems in the planned voyage initially described in the forwarded Asiaworld Shipping Services email. The letter accused Gateway of deceiving DGM and Tomago by planning to breach the shipping contract. Reeves sent copies of this letter to four Tomago representatives. (*Id.* at ¶ 13).

Gateway also alleges that DGM employees made defamatory statements about Gateway to others. Gateway alleges two such statements by St. Ledger. The first allegedly

6

took place when St. Ledger, Peter Hall, a Tomago employee, Sally Doney, a HBL/ChemTrans employee, and Pitcock of Gateway were together in late March 2005. Gateway alleges that St. Ledger, Hall, and Doney were standing in a group and when Pitcock approached, St. Ledger said, "Ah, there's that lying, cheating con-man from Texas." (*Id.* at ¶ 14). The second allegedly took place on March 31, 2005, when St. Ledger telephoned Diane Shults, a Gateway employee in Houston, and stated that Pitcock and George Smith, Gateway's president, were "crooks" and "very good con men" who had "totally screwed DGM" with respect to the SPL shipment on the *Marlene Green*. (*Id.* at ¶ 15). Gateway alleges that these statements were false.

After this court permitted Gateway to take jurisdictional discovery, the defendants produced what Gateway alleges are two additional defamatory emails. On March 12, 2005 at 8:14 a.m., St. Ledger allegedly forwarded to Mark Petillon, Branch Manager of DGM Services, Inc. in Houston Texas,[1] an email signed by Jason Mallard, Managing Director of DGM Australia. In the forwarded email, dated Saturday, March 5, 2005, 4:19 p.m., Mallard wrote, "As far back as July last year Gateway must have known that the 'Marlene Green' was too large a vessel for this charter requirement. Therefore, they must have always covertly intended to arrange this as a part charter and find other cargoes in collusion with BBC." (Docket Entry No. 20, Ex. H). Mallard also wrote that, in light of the costs involved and the

---

[1] DGM Services, Inc. has no common or overlapping ownership interest or management with defendant DGM, Australia Pty, Ltd. (Docket Entry No. 21, Ex. A, ¶ 2). Petillon has testified by affidavit that neither he nor DGM Services, Inc. had any involvement with the Joint Venture Agreement with Tomago. (*Id.* at ¶¶ 5–6). Petillon and St. Ledger are friends. (*Id.* at ¶ 3).

fact that no party other than Gateway had seen any invoices from BBC, "presumably Gateway must have some sort of cashback arrangement with BBC in place to cover the possibility of ever being asked to prove that they paid the 1.05M to BBC." (*Id.*). Mallard concluded the message by stating, "I firmly believe Gateway never intended to mention the ship was going to take on other cargo until the actual moment someone noticed it heading for the K2 wharf. Even then they no doubt intended to feign surprise and apportion all blame to BBC." (*Id.*). St. Ledger forwarded this email to Petillon with the transmittal message: "Fyi...." (*Id.*).

On March 12, 2005 at 8:15 a.m., St. Ledger forwarded a chain of email messages to Petillon with another "Fyi . . ." introduction. (Docket Entry No. 20, Ex. I). The chain included another email written by Mallard. In that email, which was sent from Australia on Saturday, March 5, 2005 at 11:15 a.m., Mallard stated that Gateway and Pitcock had about the location of the vessel *Marlene Greene* and deceived Tomago by claiming that the vessel was delayed and would require paying workers overtime to reach Italy on schedule. Mallard wrote, "As the events of the last couple of days have unfolded, I would have to say that in my opinion Mr. Pitcock has taken the art of lies & deception to a level almost beyond belief. Perhaps he has developed a taste for a little Colombian marching powder and has lost his mind? We must remain focused on providing a satisfactory outcome for Tomago, we'll deal with Pitcock after the SPL is safely on the water." (*Id.*). Mallard ended his email with a message to St. Ledger, "See you on Sunday night." (*Id.*)

This email was preceded by other email messages. In an email dated March 5, 2005

at 8:39 AM, St. Ledger wrote an email to Ray Davies, which stated in part, "It has become abundantly clear to me that [Pitcock] fully intended to land this vessel in Newcastle on Mar18-19 without any reference to the fact that it was accepting other port cargoes and calling at ports en-route to Italy. . . . As I have already mentioned our relationship with Pitcock and Gateway has been terminated as a result of this greedy, deceitful, and stupid plan." (*Id.*).  This message was part of the group of emails St. Ledger forwarded to Petillon in Texas.

All the defendants have moved to dismiss for lack of personal jurisdiction.

## II.   The Legal Standards

"In a diversity action, a federal court may exercise personal jurisdiction over a defendant to the extent permitted by the applicable state law." *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 867 (5th Cir. 2001).  The Texas long-arm statute, TEX. CIV. PRAC. & REM. CODE ANN. § 17.041 *et seq.*, confers jurisdiction to the limit permitted by due process.  *Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex. 1990) (citation omitted); *see also Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 413 n.7 (1984); *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 424–25 (5th Cir. 2005).

Due process limits the exercise of personal jurisdiction over nonresident defendants to cases in which defendants purposefully establish "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).  A court must determine  whether the

defendant has established minimum contacts with the forum state and whether the exercise of jurisdiction would offend traditional notions of fair play and substantial justice. *Polythane,* 993 F.2d at 1205 (citations omitted).

A court may assert personal jurisdiction under a theory of either "general" or "specific" personal jurisdiction.  A court exercises specific jurisdiction over a defendant if the cause of action alleged arises out of or is related to the defendant's contacts with the forum.  *Helicopteros*, 466 U.S. at 414 n.8.  When a court exercises personal jurisdiction over a defendant in a case not arising out of or related to the defendant's contacts with the forum state, the court is exercising general jurisdiction over the defendant.  *Id.* at 414 n.9.

A court may exercise specific jurisdiction if:  (1) the defendant purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; and (2) the controversy arises out of or is related to the defendant's contacts with the forum state.  *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 343 (5th Cir. 2004).  The plaintiff must demonstrate a nexus between the nonresident defendant's contacts with the forum and the cause of action.  *Rittenhouse v. Mabry,* 832 F.2d 1380, 1390 (5th Cir. 1987).  A court must "examine the relationship among the defendant, the forum, and the litigation to determine whether maintaining the suit offends traditional notions of fair play and substantial justice."  *Southmark Corp. v. Life Investors, Inc.,* 851 F.2d 763, 772 (5th Cir. 1988) (citations omitted).  Specific jurisdiction is limited to the particular controversy that arises out of or is related to the defendant's contacts with the forum.  *Petroleum Helicopters, Inc. v. Avco Corp.*, 804 F.2d 1367, 1370 (5th Cir. 1986).  If a defendant's contact with the

10

forum "resulted from the defendant's conduct and created a substantial connection with the forum state, even a single act can support [specific personal] jurisdiction." *Ham v. La Cienega*, 4 F.3d 413, 415 (5th Cir. 1993); *see also McGee v. Int'l Life. Ins. Co.*, 355 U.S. 220, 223 (1957); *Brown v. Flowers Indus., Inc.*, 688 F.2d 328, 332–34 (5th Cir. 1982). It is "well established," however, that "merely contracting with a resident of a forum state is insufficient to subject the nonresident to the forum's jurisdiction." *Freudensprung*, 379 F.3d at 344 (quoting in part *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 778 (5th Cir. 1986) (additional citations omitted)).  When the asserted basis of jurisdiction is that the defendant "directed a tort" to the forum, the test is not whether the defendant allegedly committed a tort that affected a forum resident, but rather whether the defendant's forum contacts show purposeful availment. *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777 (Tex. 2005).

When the cause of action does not arise from or relate to the foreign defendant's purposeful conduct within the forum state, due process requires that the foreign defendant have engaged in continuous and systematic contacts with the forum state before a court may exercise general personal jurisdiction. *Helicopteros*, 466 U.S. at 414–15; *Bearry v. Beech Aircraft Corp.* 818 F.2d 370, 374 (5th Cir. 1987).  The plaintiff must demonstrate contacts of a more extensive quality and nature between the forum state and the defendant than those needed to support specific jurisdiction. *Dalton v. R & W Marine,* 897 F.2d 1359, 1362 (5th Cir. 1990) (citations omitted).  "To exercise general jurisdiction, the court must determine whether 'the contacts are sufficiently systematic and continuous to support a reasonable

11

exercise of jurisdiction.' " *Holt Oil & Gas,* 801 F.2d at 777 (quoting *Stuart v. Spademan*, 772 F.2d 1185, 1191 (5th Cir. 1985) (additional citations omitted)).

When a nonresident defendant challenges personal jurisdiction, the plaintiff bears the burden of demonstrating facts sufficient to support jurisdiction. *Stuart,* 772 F.2d at 1192 (citations omitted). "The court may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Id.* "When the district court rules on a motion to dismiss for lack of personal jurisdiction 'without an evidentiary hearing, the plaintiff may bear his burden by presenting a *prima facie* case that personal jurisdiction is proper.'" *Quick Techs., Inc. v. Sage Group PLC*, 313 F.3d 338, 343 (5th Cir. 2002) (quoting *Wilson v. Bolin*, 20 F.3d 644, 648 (5th Cir. 1994)). The court "must accept as true the uncontroverted allegations in the complaint and resolve in favor of the plaintiff any factual conflicts." *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 869 (5th Cir. 2000) (quoting *Latshaw v. Johnson*, 167 F.3d 208, 211 (5th Cir. 1999)) (additional citations omitted). The court is not obligated to credit conclusory allegations, however, even if uncontroverted. *Panda Brandywine Corp. v. Potomac Elec. Power*, 253 F.3d 865, 868 (5th Cir. 2001).

## III.   Analysis

### A.   DGM

Gateway contends that DGM purposely availed itself of the laws and benefits of Texas by executing the Joint Venture Agreement in Texas and by including in that Agreement a Texas choice-of-law provision and an arbitration clause binding both parties

to arbitration in Houston, Texas.  The execution of the Agreement in Texas and the inclusion of a Texas choice-of-law provision in the Agreement are insufficient to establish personal jurisdiction over DGM.  The arbitration clause, which selects Texas as the forum for arbitration and for the judicial selection of an arbitrator, is a more complicated question.

"[A]n exchange of communications between a resident and a nonresident in developing a contract is insufficient of itself to be characterized as purposeful activity invoking the benefits and protection of the forum state's laws."  *Stuart*, 772 F.2d at 1193 (citing *Hydrokinetics, Inc. v. Alaska Mech., Inc.*, 700 F.2d 1026, 1029 (5th Cir. 1982); *Charia v. Cigarette Racing Team, Inc.*, 583 F.2d 184, 187–88 (5th Cir. 1978); *Benjamin v. W. Boat Building Corp.*, 472 F.2d 723, 739 (5th Cir. 1973)); *see also Dudek v. Donald C. & Eleanor J. Glanville Revocable Trust*, 109 Fed. Appx. 657, 659 (5th Cir. 2004) (finding no personal jurisdiction over nonresident defendant trust when the sole contact was a contract that did not require performance other than payment by the defendant in the forum state); *Blair Commc'ns, Inc. v. SES Survey*, 80 S.W.3d 723, 730 (Tex. App. – Houston [1st Dist.] 2003, no writ) ("We do not believe that initiating contract discussions with a Texas resident, and subsequently entering into a contract, in addition to making payment in Texas, are sufficient contacts with Texas when the entire substance of the contract is performed outside the state.").

"[A] choice-of-law provision should neither be ignored nor considered sufficient alone to confer jurisdiction."  *Electrosource, Inc. v. Horizon Battery Tech., Ltd.*, 176 F.3d 867, 873 (5th Cir. 1999).  The choice of Texas law does not in itself support a finding of personal

13

jurisdiction over DGM in a Texas court.  The combination of choosing Texas law and designating Texas as the arbitration forum, however, does support a finding that DGM anticipated and foresaw further contacts with Texas.

Courts have rejected claims of specific personal jurisdiction in cases involving disputes arising from contracts that select a forum other than where the suit was filed.  In *Marathon Oil Co. v. A.G. Ruhrgas*, 182 F.3d 291 (5th Cir. 1999), for example, the court held that the defendant had no reasonable expectation of being sued in Texas based on attending three  meetings in Texas to negotiate a contract specifying Norwegian law and providing for arbitration in Sweden.  *Id.* at 295.  In *International Technology Consultants, INc. v. Euroglass S.A.*, 107 F.3d 386 (6th Cir. 1997), the court held that Michigan lacked jurisdiction over the defendant in a dispute over a contract that specified Swiss law and and chose Switzerland as the forum for resolution.  *Id.* at 396.  In *Hydrokinetics, Inc. v. Alaska Mechanical, Inc.*, 700 F.2d 1026 (5th Cir. 1983), the Fifth Circuit held that the defendant did not purposely avail itself of the laws and protections of Texas by negotiating a contract with a Texas company and traveling to Texas twice to resolve other disputes arising out of the contract, in part because the contract stipulated that Alaska law governed.  *Id.* at 1029.  This case presents the flip side of the same question.  In this case, the issue is whether DGM is subject to jurisdiction in Texas because it executed a contract that designated Texas as the place for arbitration and as the source of the governing law.

Several courts of appeals have addressed whether a contract with an arbitration clause that selects a particular forum for the arbitration permits a court in that forum to exercise

specific personal jurisdiction over a signatory to that contract.  In *St. Paul Fire and Marine Insurance Co. v. Courtney Enterprises, Inc.*, 270 F.3d 621 (8th Cir. 2001), the Eighth Circuit held that signing such a contract subjects the signatories to the jurisdiction of the courts in that forum.  In that case, Courtney Enterprises, a  Texas  company, entered into an insurance contract containing an arbitration/forum-selection provision that read, "The matter shall be determined by arbitration conducted in the City of St. Paul, State of Minnesota . . . . The arbitrator(s) shall apply the substantive law of the State of Minnesota as the proper law of this Agreement." *Id.* at 623.  The court held that by agreeing to the forum-selection clause, Courtney Enterprises "impliedly consented to be sued in Minnesota to compel arbitration of such disputes.  'Due process is satisfied when a defendant consents to personal jurisdiction by entering into a contract that contains a valid forum selection clause.' " *Id.* at 624 (quoting *Dominium Austin Partners, L.L.C. v. Emerson*, 248 F.3d 720, 726 (8th Cir. 2001) and citing *Unionmutual Stock Life Ins. of Am. v. Beneficial Life Ins. Co.*, 774 F.2d 524, 527 (1st Cir. 1985); *Petrol Shipping Corp. v. Kingdom of Greece*, 360 F.2d 103, 107 (2d Cir. 1966)).  The court also noted that this result was important to achieving the purpose of the Federal Arbitration Act.  "Implying consent to personal jurisdiction from the forum selection clause in an agreement to arbitrate is necessary to implement the statutory requirement that an arbitration hearing must be held 'within the district in which the petition for an order directing such arbitration is filed.' "  *St. Paul Fire and Marine Ins. Co.*, 270 F.3d at 624 (quoting 9 U.S.C. § 4).  The court explained:

> When the agreement to arbitrate includes a forum selection

15

clause, most courts have concluded that "only a district court in that forum has jurisdiction to compel arbitration pursuant to Section 4 [of the Federal Arbitration Act].". . . Thus, if the court in the selected forum did not have personal jurisdiction to compel arbitration, the agreement to arbitrate would be effectively unenforceable, contrary to the strong national policy in favor of arbitration.

*Id.*

The Ninth Circuit has taken a broader view of the importance of an arbitration/forum-selection provision in assessing specific personal jurisdiction.  In *Unic Oil Compania v. Internacional de Granos E Insumos S.A. de C.V.*, 92 F.3d 1194, No. 94-16753, 1996 WL 429172 (9th Cir. 1996), the parties executed an agreement that included a choice-of-law clause specifying California law and calling for arbitration of any disputes to take place in California.  Unic sued on the contract in California and the district court granted the defendants' motions to dismiss for lack of personal jurisdiction.  The Ninth Circuit reversed. The court applied its test for specific personal jurisdiction: (1) the nonresident defendant must do some act or consummate some transaction with the forum or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or results from the defendant's forum-related activities; and (3) the exercise of jurisdiction must be reasonable.  *Id.* at *3 (quoting *Data Disc, Inc. v. Sys. Tech. Assoc.*, 557 F.2d 1280, 1287 (9th Cir. 1977)).  The dispute arose out of the underlying contract, which the defendants had negotiated with Unic over the telephone and through the mails.  The fact that the contract included a California choice-of-laws provision and a California forum-

16

selection provision "clearly indicate[d] that further contacts with California were anticipated and foreseeable." *Unic Oil Compania*, 1996 WL 429172 at *4. The court held that California courts had specific personal jurisdiction over the defendants to resolve disputes arising out of the contract.

The Second Circuit takes an equally expansive view. As early as 1964, that court has held that an enforceable arbitration agreement that includes a forum-selection clause for holding the arbitration—like the arbitration/forum-selection clause in the Joint Venture Agreement—requires a finding that the parties have also consented to personal jurisdiction of the courts in that forum. *See Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 352 (2d Cir. 1999); *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 979 (2d Cir. 1996) (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lecopulos*, 553 F.2d 842, 844 (2d Cir. 1977); *Victory Transp. Inc. v. Comisaria General de Abastecimientos y Transportes*, 33d F.2d 354, 363 (2d Cir. 1964)). In *Lecopulos*, the defendant argued that he was not subject to jurisdiction in the forum designated in the arbitration/forum-selection provision because the plaintiff had sued him in state court "rather than proceeding directly to arbitration." *Lecopulos*, 553 F.2d at 845. The court rejected this claim, noting that "under federal law the filing of an action in a district court is not a waiver of the right to arbitrate, at least not before the defendant has answered on the merits, which Lecopulos has not done." *Id.* (citing *Chatham Shipping Co. v. Fertex Steamship Corp.*, 352 F.2d 291 (2d Cir. 1965);

*Carich v. Rederi A/B Nordie*, 389 F.2d 692, 695–96 (2d Cir. 1968) (footnote omitted)).[2]

Likewise, DGM signed the Joint Venture Agreement, which designated Houston, Texas as

the forum and Texas law as governing, and has not filed a responsive pleading in this case.

This case is similar to *St. Paul Fire and Mutual Insurance Company*, *Unic Oil*, and

*Lecopulos* in that DGM entered into a contract that obligated it to arbitrate all disputes

arising out of the contract in Texas and designated Texas law as the governing law.  The

Joint Venture Agreement not only required arbitration in Texas, it also required the parties

to seek the aid of a specified federal judge in Texas to achieve the appointment of an

arbitrator if the parties could not agree.  The parties expressly, not merely implicitly, agreed

to personal jurisdiction in Texas for arbitration and for a judicial proceeding in aid of that

arbitration.  This case is unlike *St. Paul Fire and Mutual Insurance Company* and *Unic Oil*

in that Gateway sued DGM in Texas court and did not invoke the arbitration provision.

Both implicitly and explicitly, the parties agreed to jurisdiction in Texas, but limited

to arbitration and to judicial proceedings necessary to arbitration.  *Cf. Freudensprung*, 379

F.3d at 345 ("Although in certain circumstances, an arbitration agreement may alter an

---

[2] Some New York state courts disagree with this view of personal jurisdiction. *See, e.g.*, *Koob v. IDS Fin. Srvs, Inc.*, 213 A.D.2d 26 (1st Dept. 1995) (disagreeing with *Lecopulos* on the grounds that the Second Circuit misinterpreted a choice-of-laws provision for a forum-selection provision); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. McLeod*, 208 A.D.2d 81, 83–84 (1st Dept. 1995) (same).  Nevertheless, the Second Circuit adheres to this view. *See, e.g.*, *Am. Bureau of Shipping*, 170 F.3d at 352 ("It is well settled that federal courts applying New York law have personal jurisdiction over parties that agree to arbitrate their disputes in New York.") (citations omitted); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Shaddock*, 822 F. Supp. 125, 128 (S.D.N.Y. 1993).  The point of dispute between the state and federal courts in New York is academic with respect to this case, however, because the Joint Venture Agreement designated both Texas law as controlling and Houston, Texas as the arbitration forum.  The Fifth Circuit has not taken a position on this issue.

otherwise decisive jurisdiction analysis by evidencing a nonresident's implied consent to jurisdiction, this principle is inapplicable in the instant case where the arbitration agreement at issue only contemplates arbitration between WWAI and OTSI [the defendants], not Freudensprung [the plaintiff].  Thus, even if WWAI may have expected to arbitrate disputes between itself and OTSI in Texas, it does not concomitantly follow that WWAI reasonably anticipated being haled into a Texas court to defend a lawsuit brought by Freudensprung or any other nonparty to the Offshore Personnel Supply Agreement.").

DGM anticipated arbitration in Texas and litigation in Texas for the limited purpose of enforcing the parties' arbitration agreement.  The arbitration/forum-selection provision specifically requires both parties to arbitrate any disputes in Houston, Texas and to apply to the Chief Judge of the Southern District of Texas to appoint an arbitrator if the parties cannot agree to one themselves.  (Docket Entry No. 5, Ex. 2-A, ¶ 12.8).  In *St. Paul Fire and Mutual Insurance Company*, the plaintiff sought an order compelling arbitration.  In this case, however, neither party has invoked or sought to enforce the arbitration agreement.  Under the Second Circuit's approach in *Lecopulos*, neither Gateway nor DGM has waived arbitration, and under a more restrictive approach, DGM has clearly not waived its right to compel arbitration.  "Despite the possibility of waiver, there is a well-settled rule in this circuit that waiver of arbitration is not a favored finding, and there is a presumption against it."  *Keytrade USA, Inc. v. Ain Temouchent M/V*, 404 F.3d 891, 897 (5th Cir.  2005) (citing and quoting *Williams v. Cigna Fin. Advisors, Inc.*, 56 F.3d 656, 661 (5th Cir. 1995); *Miller Brewing Co. v. Fort Worth Distrib. Co., Inc.*, 781 F.2d 494, 497 (5th Cir. 1986)) (internal

19

marks and quotations omitted).  To waive the right to arbitrate, "[t]he party must, at the very least, engage in some overt act in court that evinces a desire to resolve the arbitrable dispute through litigation rather than arbitration."  *Id.* (citing *Republic Ins. Co. v. PAICO Receivables, LLC*, 383 F.3d 341, 344 (5th Cir. 2004); *Subway Equip. Leasing Corp. v. Forte*, 169 F.3d 324, 329 (5th Cir. 1999) (internal marks and quotations omitted).  DGM has yet to engage in any overt act in court evincing a desire to resolve this arbitral dispute through litigation rather than arbitration.  Under the applicable authority, DGM foresaw, and consented to, jurisdiction in a Texas court.  *St. Paul Fire and Marine Ins. Co.*, 270 F.3d at 624.

Even if DGM personally availed itself of the benefits of Texas law, the exercise of jurisdiction may nonetheless be unreasonable.  Courts evaluate: (1) the burden on the defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies.  *Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found.*, 297 F.3d 1343, 1355 (Fed. Cir. 2002) (citing *Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 113 (1987) (additional citations omitted)).  Other factors include: (1) the extent of the defendant's purposeful injection into the forum; (2) the defendant's burdens from litigating in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in litigating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in

20

convenient and effective relief; and (7) the existence of an alternative forum. *Terracon v. Valley Nat'l Bank*, 49 F.3d 555, 561 (9th Cir. 1995).   Some courts apply a sliding scale approach to this test, requiring a weaker showing of unreasonableness when the evidence of minimum contacts is weak. *See, e.g.*, *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 210 (1st Cir. 1994).

DGM cannot persuasively argue that litigating in Texas is overly burdensome because it agreed to arbitrate in Texas and to litigate certain matters relating to the arbitration.   The Joint Venture Agreement addressed the burdens of such proceedings, stating that, "Each Participant shall pay its own costs of the arbitration, including attorneys' fees, preparation costs and travel expenses." (Docket Entry No. 5, Ex. 2-A, ¶ 12.8).  When it executed the Joint Venture Agreement, DGM could reasonably foresee arbitration and related litigation in Texas.   Texas has an interest in the resolution of disputes involving its citizen and an interest in having Texas courts apply and interpret Texas law (as required by the Joint Venture Agreement).  Whether this dispute is resolved in Texas or Australia, there will be inconvenience to the parties.  Although most of the relevant conduct took place in Australia and many of the witnesses will be in Australia, Gateway's witnesses will largely be in Texas, which weighs against a finding of unreasonableness.  Viewing all of these factors as a whole, DGM has not shown that it is constitutionally "unreasonable" for this court to decide this case.  DGM's motion to dismiss for lack of personal jurisdiction is denied.

### B.    The Remaining Defendants

21

Gateway claims that the remaining defendants' allegedly defamatory statements, published in Texas via electronic mail and the telephone, provide a basis for personal jurisdiction. Gateway relies on what the Texas Supreme Court recently characterized as the "directed-a-tort" basis for personal jurisdiction over nonresident defendants. In *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777 (Tex. 2005), the court made it clear that allegations of a nonresident defendant's tortious misrepresentations made by telephone to the forum state cannot be the basis for determining specific personal jurisdiction. More broadly, the court expressly rejected personal jurisdiction based on allegations as to where a defendant "directed-a-tort," as opposed to where the defendant had contacts relating to the transaction and events at issue. The court noted that focusing on where the defendant allegedly directed a tort incorrectly emphasized the relationship among the plaintiff, the forum, and the litigation, rather than among the defendant, the forum, and the litigation. The minimum-contacts analysis, by contrast, properly focuses "solely on the actions and reasonable expectations of the defendant." *Id.* at 790 (citing *Burger King*, 471 U.S. at 481–82). The court also criticized the "directed-a-tort" test as conflating the jurisdictional inquiry with analysis of the merits, because the nonresident could defeat jurisdiction by showing that there was no tort. The court noted that the personal jurisdiction outcome should not turn on whether the defendant is sued in tort or contract, but on the defendant's purposeful availment of the forum state. The court also instructed that reliance on telephone calls—and email—can no longer reliably prove purposeful availment, given the fact that technology now permits an individual located anywhere in the world to be reached by a single telephone

22

number or a single email address.  *Id.* at 790.

*Holten* greatly undermines the basis of Gateway's personal jurisdiction theory as to St. Ledger, Cridlands, and Reeves.[3]  There are almost no contacts between these defendants and Texas.  St. Ledger's contacts with Texas consist of his single trip to Houston to sign that agreement on DGM's behalf.  The Joint Venture Agreement, which is part of the record, established a contract between DGM in Australia and Gateway in Texas to provide logistical and shipping services to Tomago, an Australian company.  The services were limited to shipping SPL from Australia to Italy under an Australian federal government export license owned by DGM.  (Docket Entry No. 5, Ex. 2-A at 5–6).  The contract included a provision extending the agreement "to any other party to which the participants may mutually agree to provide services in connection with the Joint Venture."  (*Id.* at 6).  This provision extends the contract only to other entities necessarily involved in the Joint Venture.  While the Joint Venture Agreement does contain the choice-of-law and forum-selection clauses discussed above, St. Ledger was not a party to the Agreement.

Jimmy St. Ledger's lone trip to Texas in his capacity as a DGM employee to execute the Joint Venture Agreement is insufficient to subject him to  this court's jurisdiction.  The Joint Venture Agreement that St. Ledger signed in Houston required all performance to take place in Australia and Italy.  St. Ledger worked from Australia for an Australia-based company, DGM, on behalf of an Australian client, Tomago.  His motion to dismiss for lack

---

[3] Gateway urged this theory in its initial response to the motions to dismiss.  (Docket Entry No. 13).

of personal jurisdiction is granted.

The contacts between Reeves and the law firm for which she worked, Cridlands, and Texas are even  more attenuated.  Reeves sent a letter to Gateway outlining DGM's complaints about Gateway's contract performance.  Reeves sent that letter as part of her work for Cridlands representing DGM with respect to the Joint Venture Agreement.  Reeves's alleged tort—defamation—took place when she published this letter to a third party, Tomago in Australia.  This contact is insufficient to confer jurisdiction in Texas.   Reeves and Cridlands are not subject to this court's jurisdiction.

## IV.    Conclusion

Gateway has made a *prima facie* case of specific personal jurisdiction over DGM; it has not done so with respect to St. Ledger, Reeves, or Cridlands.  Gateway has made no showing of general jurisdiction as to any party.  DGM's motion to dismiss is denied.  The motions to dismiss filed by St. Ledger, Reeves, and Cridlands are granted.

DGM must file a responsive pleading—which may be a motion to compel arbitration in accordance with the Joint Venture Agreement—or an answer on the merits by **June 12, 2006**.  This court will hold the initial pretrial and scheduling conference on **June 20, 2006 at 9:00 AM** in Courtroom 11-B.

SIGNED on May 31, 2006, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge

24