**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| THE GATEWAY LOGISTICS GROUP, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. H-05-2742 |
| DANGEROUS GOODS MANAGEMENT AUSTRALIA PTY, LTD, *et al.,* | § § § | |
| Defendants. | § § | |

**MEMORANDUM AND OPINION**

The Gateway Logistics Group, a Texas company, sues Dangerous Goods Management

Australia Pty, Ltd. ("DGM"), an Australian company.[1]  Gateway alleges state-law claims for

libel *per quod*, libel *per se*, tortious interference with existing and prospective business

relations, business disparagement, breach of contract, and breach of the duty of good faith

and fair dealing.  (Docket Entry No. 34).  DGM moved for partial summary judgment on the

issue of whether the statements are defamatory *per se*.  (Docket Entry No. 48).  Gateway

cross-moved for partial summary judgment on the same issue. (Docket Entry No. 50).  Both

parties have filed responses, and DGM filed a reply.  (Docket Entry Nos. 50, 51).

The only issue raised by the cross-motions is whether Gateway will have to present

---

[1] Gateway also named as defendants Cridlands Pty, Ltd., an Australian law firm representing DGM; Tracy Reeves, a Cridlands lawyer; and Jimmy St. Ledger, a DGM employee.  These defendants are Australian citizens.  This court granted the motions to dismiss based on lack of personal jurisdiction filed by St. Ledger, Cridlands, and Reeves.  (Docket Entry No. 25).

evidence of special damages or whether damages may be presumed because the statements are "so obviously hurtful that they require no proof that they caused injury. . . ." *Fiber Systems Intern., Inc. v. Roehrs*, 470 F.3d 1150, 1161 (5th Cir. 2006).This court finds that the written statements contained in the March 10, 2005 letter and the emails of March 5, 2005 are defamatory *per se* and that the oral statements that were allegedly made at the end of March 2005 were not. The cross-motions for partial summary judgment are granted in part and denied in part, for the reasons set out below.

## I.      Background

Gateway provides logistical services for the shipping and transportation industry. DGM provides services relating to packaging and transporting dangerous goods and hazardous substances.  On August 20, 2005, Gateway and DGM entered into a Joint Venture Agreement to provide services for transporting a form of aluminum waste known as "Spent Pot Lining" ("SPL") for Tomago Aluminum Company, an Australian smelting company. The agreement required Gateway and DGM to provide Tomago with logistical, stevedoring, and shipping services to move the SPL from Newcastle, Australia to a disposal point in Italy. The Joint Venture Agreement called for Gateway and DGM to divide the duties and profits arising out of the agreement evenly.  Jimmy St. Ledger, who works for DGM, executed the Joint Venture Agreement with Gateway on behalf of DGM.  Tracy Reeves, an attorney with Cridlands Pty., Ltd., represented DGM.

The parties' dispute  arose when Tomago hired Gateway and DGM to transport SPL from Newcastle, Australia to Porto Margera, Italy.  Under the Joint Venture Agreement,

Gateway hired BBC Chartering & Logistics, a German company, to obtain vessels to ship the SPL.  On September 21, 2004, the SPL was loaded onto the *M/V BBC Campana* at the Port of Newcastle and shipped to Porto Margera, Italy.  On November 28, 2004, the *M/V BBC Ontario* was loaded with SPL at the Port of Newcastle for shipment to the same destination.  The only stop on either voyage was a single fuel stop in Singapore.  On February 8, 2004, BBC Chartering & Logistics obtained a third vessel, the *M/V Marlene Green*, to ship additional SPL for Tomago from the Port of Newcastle to Porto Margera, Italy.

SPL is a hazardous substance.  Its shipment is heavily regulated.  Tomago holds a hazardous materials export license from the Australian government.  The export license required SPL to be shipped nonstop from the port of departure to the final destination.  Shipping SPL with other cargo that would require additional stops beyond those necessary for refueling could violate the export license, which could expose Tomago to penalties or revocation of its license.

Gateway alleges that DGM, through its employee, St. Ledger, and its lawyer, Reeves, made defamatory statements orally and in writing about Gateway to Tomago, the joint client of both Gateway and DGM, in connection with the planned March 2005 shipment of SPL on the *M/V Marlene Green.*  Gateway alleges that DGM told Tomago representatives in person and through correspondence that Gateway: intended to ship additional cargo along with Tomago's SPL; planned to have the vessel make stops en route to the final destination; and intentionally misled and deceived Tomago about the shipment.  Gateway alleges that DGM's

3

communications were "aimed directly at harming Gateway's relationship with the parties' joint customer Tomago." (Docket Entry No. 50 at 3). Gateway alleges that DGM made these statements with the intent to "wrest from Gateway total control of the Tomago business and, therefore, all of the profits to be made from the SPL shipments." (Docket Entry No. 34, ¶ 8).

On March 2, 2005, Geoff Beasley of Newcastle Stevedores forwarded St. Ledger an email originating from Asiaworld Shipping Services, a shipping company. The forwarded email contained a stowage plan indicating that cargo besides the SPL would be loaded onto the *Marlene Green* and that the vessel would stop at other ports of call during the voyage to Italy. St. Ledger forwarded the email to Jason Pitcock, Gateway's project manager. Pitcock recognized the potential problems for Gateway and asked St. Ledger at DGM for additional information. Gateway alleges that DGM refused to provide further information at that time. (Docket Entry No. 34, ¶¶ 7–8).

The first category of allegedly defamatory statements consists of statements made in a March 10, 2005 letter from Reeves to Pitcock at Gateway. The letter discussed the problems in the planned voyage described in the forwarded Asiaworld Shipping Services email. The letter accused Gateway of planning a shipment that would breach the joint venture contract with DGM and would violate Tomago's export license. Gateway alleges that the following statements in the letter were defamatory:

- the statement that Gateway engaged a part charter (as opposed to a full-charter vessel to ship the SPL), which "constitutes a fundamental violation of Tomago's EA export licence, exposing it to massive punitive damages";

- the statement that Gateway's alleged conduct was "a breach of the relevant environmental and licensing regimes applying to these shipments";

- the statement that "[i]t is clear that Gateway falsely represented to both DGM and Tomago that it was engaging in full charter vessels for the shipment of Tomago's SPL as required under the terms of its contractual arrangements and in doing so, has displayed reckless disregard for the potential risk to DGM and Tomago arising from the shipment of SPL in contravention of the EA export licence provisions";

- the statement "[t]hat Gateway chose not to disclose its arrangement for a part charter of Tomago's shipment is further evidence that Gateway intentionally misled and deceived DGM and Tomago as to the method of shipment";

- the statement that "Gateway knew that a part charter of Tomago's shipment was unlawful and that it could cause serious detriment to DGM and Tomago, and yet it chose to remain silent as to the true nature of its shipping arrangements"; and

- the statement that "[o]ur client submitted a joint venture agreement to you for signing, however, you amended that document prior to it being signed without advising our client."

Reeves sent copies of this letter to four Tomago employees.  (Docket Entry No. 34, ¶ 9; Docket Entry No. 50, Ex. B).

5

The second category of defamatory statements alleged consists of emails. The first was sent on March 5, 2005 by Jason Mallard, DGM's Managing Director, to St. Ledger, with copies to three Tomago employees, Ray Davies, Paul Adkins, and Peter Hall. Mallard stated:

> I have been giving some analytical thought to this appalling ship fiasco and have concluded the following.,
>
> • As far back as July last year Gateway must have known that the "Marlene Green" was too large a vessel for this charter requirement.
>
> • Therefore, they must have always covertly intended to arrange this as a part charter and find other cargoes in collusion with BBC.
>
> • The true market value of moving the SPL load on a part charter basis would be circa ~600 - 700 K.
>
> • Gateway advised both Tomago & DGM the cost of this ship had been set at 1.05M.
>
> • To the best of my knowledge no one other than Gateway has seen a copy of a BBC invoice.
>
> • So, if the REAL cost is ~600 - 700K, presumably Gateway must have some sort of cashback arrangement with BBC in place to cover the possibility of ever being asked to prove that they paid the 1.05M to BBC.
>
> • So, I now suspect BBC are up to the gills in this, and wonder what the actual real cost of the last two vessels really was?
>
> I firmly believe Gateway never intended to mention the ship was going to take on other cargo until the actual moment someone noticed it heading for the K2 wharf. Even then they no doubt

> intended to feign surprise and apportion all blame to BBC.
>
> It's not possible to mention my thoughts regarding Jason Pitcock & George Smith [the president of Gateway] without resorting to profanity.

(Docket Entry No. 34, ¶ 13; Docket Entry No. 20, Ex. H).  On March 12, 2005, St. Ledger forwarded this email to Marc Petillon, the Branch Manager for DGM Services, Inc., located in Houston, with the transmittal message:  "Fyi. . . ."  (*Id.*).

On March 12, St. Ledger forwarded other emails to Petillon.  These emails included an email St. Ledger sent to Davies in response to his email message that he had learned from a website that the *Marlene Greene* was in Southeast Asia, not the Far East/Russia Pacific region, and that the *Marlene Green* was "seeking cargo in S.E. Asia at the end of March to go to the Mediterranean."  (Docket Entry No. 20, Ex. I at 3).  On March 5, St. Ledger responded to Davies at Tomago, as follows:

> Hello Ray,
>
> Many thanks for the information, although I must admit that I had already suspected this was the case with this vessel. . . Once again I can't find strong enough words to convey my sense of anger and despair right now – I just don't know what Pitcock was thinking?  It has become abundantly clear to me that he fully intended to land this vessel in Newcastle on Mar18-19 without any reference to the fact that it was accepting other part cargoes and calling at ports en route to Italy.  If while the vessel was in port and TAC or DGM had discovered the plan to accept other cargo then I am sure that with the containers either at the port or worse on the vessel Pitcock would have simply adopted a "take it or leave it" attitude . . . Honestly Ray I am so angry about all of this  .  .  .  As I have already mentioned our relationship with Pitcock and Gateway has been terminated as a result of this greedy, deceitful and very stupid plan.

7

I know we are all in a tight spot here but at the same time it is fortunate that I discovered this covert plan when I did because at least we have a bit of time (admittedly not much) at our disposal to recover from this dreadful and deceitful setback.  I spoke to Paul (Adkins) last night and he is almost certain that he never signed a booking note with Gateway for this vessel (I am certain that he hasn't due to the routing and past cargoes – he would have only entertained signing for a full charter) and in effect this means TAC are free and clear from any legal obligations to use this vessel.  Gateway certainly do not have the resources to cover the costs associated with the "part" charter of this vessel and our strategy is to call the owners on Monday with an ultimatum that they can either walk away from the USD1.05M or sign a booking note with us for a full charter as per your requirements.  We will give them 24hrs to respond and if they decline our offer then we will go into the world market to find a vessel capable of arriving into Newcastle on or before Mar 20.  We still have time to perhaps locate a Spliethoff E class vessel discharging in Singapore and looking for a backload to Europe . . . I have already started making enquires with Spliethoff in anticipation of our meeting on Monday.

I know things may seem dark and dismal right now but I want to assure you that we are taking a strong and decisive management attitude to this crisis.  TAC have been a model client of ours and we deeply respect both the commercial and personal relationship that exists between our 2 companies and I want you to know that even if we never see another dollar from these shipments we are determined and committed to ensure that the current SPL shipment departs on time and with the minimum of fuss.

(Docket Entry No. 20, Ex. I at 2–3).

Jason Mallard at DGM responded to St. Ledger's forward of his email to Ray Davies and copied the response to Davies at Tomago:

> Jimmy,
>
> Per msg from Ray, this matter just gets more extraordinary by the minute.  Correct me if I'm wrong, but weren't we all let to believe by pitCock that the reason for the late arrival of the vessel was because it encountered ice somewhere near Russia?  It would appear from Ray's investigations the ship is in S.E. Asia, an area not know for a lot of pack ice . . . .
>
> I also recall recently seeing an email from the "smiling assassin" to Paul or Ray or someone, waffling on about offering the vessel operators a "performance bonus" to get the ship in and loaded before the 21st.  Presumably, he knows the vessel is in fact in S.E. Asia and intended to try and screw Tomago out of even more cash to have the vessel arrive when it would have anyway!
>
> As the events of the last couple of days have unfolded, I would have to say that in my opinion Mr. Pitcock has taken the art of lies & deception to a level almost beyond belief.
>
> Perhaps he has developed a taste for a little Colombian marching powder and has lost his mind?
>
> We must remain focussed on providing a satisfactory outcome for Tomago, we'll deal with Pitcock after the SPL is safely on the water.

(Docket Entry No. 20, Ex. I at 1).  On March 12, 2005 at 8:15 a.m., St. Ledger forwarded these two email messages to Petillon.  (Docket Entry No. 20, Ex. I at 1).

A third category of allegedly defamatory statements consists of two oral statements by St. Ledger in late March 2005.  The first allegedly took place when St. Ledger, Peter Hall, a Tomago employee, Sally Doney, a HBL/ChemTrans employee, and Pitcock were together

9

in late March 2005.  As St. Ledger, Hall, and Doney were standing in a group, Pitcock approached, and St. Ledger allegedly said, "Ah, there's that lying, cheating con-man from Texas."  (Docket Entry No. 34, ¶ 10).  The second statement allegedly took place on March 31, 2005.  St. Ledger telephoned Diane Shults, a Gateway employee in Houston, and stated that Pitcock and George Smith were "crooks" and "very good con men" who had "totally screwed DGM" with respect to the SPL shipment on the *Marlene Green*.  (*Id.*, ¶ 11).

The only issue before this court is whether, as a matter of law, these statements were defamatory *per se* or *per quod*.

## II.    The Legal Standards

### A.    Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56.  The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact.  *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

If the burden of proof lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports the essential element or claim.  *Celotex*, 477 U.S. at 330.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it

does not need to negate the elements of the nonmovant's case. *Bourdeaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. Exxon Mobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the pleading allegations. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004). This burden is not satisfied by "some metaphysical doubt as to the material facts, conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. "Rule 56 mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of

an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### B.   Defamation

The parties agree that Texas law applies.  Under Texas law, "[d]efamation is a false statement about a person, published to a third party, without legal excuse, which damages the person's reputation." *Fiber Systems*, 470 F.3d at 1161 (quoting *Moore v. Waldrop,* 166 S.W.3d 380, 384 (Tex. App.–Waco 2005, no pet.)).  "To maintain a defamation cause of action, the plaintiff must prove that the defendant: (1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with either actual malice, if the plaintiff was a public official or public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement." *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998) (*citing Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989)).

If the plaintiff is a private person or entity, truth is an affirmative defense to a defamation claim; if the plaintiff is a public figure, falsity is a constitutionally required element of a *prima facie* case for defamation. *See Hearst Corp. v. Skeen*, 159 S.W.3d 633, 637 n.1 (Tex. 2005) (citing *Bentley v. Bunton*, 94 S.W.3d 561, 586–87 (Tex. 2002)) ("Proving falsity in a public-figure defamation case is the plaintiff's burden of proof; in such a case, the defendant does not have the burden of proving substantial truth as an affirmative defense."); *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995) (citing *Town of South Padre Island v. Jacobs,* 736 S.W.2d 134, 140 (Tex. App.–Corpus Christi 1986, writ denied) ("In suits brought by private individuals, truth is an affirmative defense to slander.").

A corporation may bring a defamation claim. *See Brown v. Petrolite*, 965 F.2d 38, 43 n.5 (5th Cir. 1992); *General Motors Acceptance Corp. v. Howard*, 487 S.W.2d 708, 712 (Tex. 1972).

Slander is an oral defamatory statement. *Randall's Food Mkts.*, 891 S.W.2d at 646 (Tex. 1995); *Patton v. United Parcel Service, Inc.*, 910 F. Supp. 1250, 1272 (S.D. Tex. 1995). Libel is a written defamatory statement. TEX.CIV.PRAC.&REM.CODE ANN. § 73.001 (2005)[2]; *M.N. Dannenbaum, Inc. v. Brummerhop*, 840 S.W.2d 624, 633 (Tex. App.–Houston [14th Dist.] 1992, writ denied). Historically, libelous statements were considered defamatory *per se*, while slander was considered defamatory *per se* only if the statement fell within specific categories, including imputation of a criminal offense, a loathsome disease, a matter incompatible with one's business, trade, profession, or office, or serious sexual misconduct. RESTATEMENT (SECOND) OF TORTS § 568 (1977). Texas courts no longer draw this distinction, finding that a defamatory statement, whether made orally or in writing, is *per se* actionable only if it falls within a specifically defined category. *See Sw. Bell Yellow Pages, Inc. v. Thomas*, No. 05-04-01722-CV, 2006 WL 217665, at *1 (Tex. App.–Dallas Jan. 30, 2006, no pet.) (citations omitted) ("If a defamatory statement constitutes libel *per quod*, the statement is actionable only upon allegation and proof of damages"); *Bradbury v. Scott*, 788 S.W.2d 31, 38 (Tex. App.–Hous. [1 Dist.], 1990, writ denied.) (finding that statements were

---

[2]"A libel is a defamation expressed in written or other graphic form that tends to blacken the memory of the dead or that tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation or to publish the natural defects of anyone and thereby expose the person to public hatred, ridicule, or financial injury." TEX.CIV.PRAC.&REM.CODE § 73.001.

libelous *per se* because they injured the defendant in her office, profession, or occupation);
50 TEX. JUR. 3D *Libel and Slander* §§ 3–4, at 24 (2008) (declining to draw a distinction
between the types of statements that constitute slander *per se* and libel *per se*).[3]

Texas courts hold that oral or written statements that impute a crime to a person or that
injure a person in his office, business, profession, or occupation may be defamatory *per se*.
*See Fiber Systems*, 470 F.3d at 1161 (quoting *Gray v. HEB Food Store No. 4*, 941 S.W.2d
327, 329 (Tex. App.-Corpus Christi 1997, writ denied)) ("For a defamatory oral statement to
constitute slander *per se*, it must fall within one of four categories: (1) imputation of a crime,
(2) imputation of a loathsome disease, (3) injury to a person's office, business, profession, or
calling, and (4) imputation of sexual misconduct."); *Columbia Valley Reg'l Med. Ctr. v.
Bannert*, 112 S.W.3d 193, 199 (Tex. App.–Corpus Christi 2003) ("statements that are
falsehoods that injure one in his office, business, profession, or occupation" are libelous *per
se*).

Whether a statement is reasonably capable of the defamatory meaning alleged, and
whether it is defamatory *per se* or *per quod*, are questions of law for the court.   *Musser v.*

---

[3]*Compare with Arant v. Jaffe*, 436 S.W.2d 169, 176 (Tex. Civ. App.–Dallas 1968, no writ) (quoting
36 TEX. JUR. 2D *Libel and Slander* § 3, at 282–283) ("In general, oral words, however opprobrious, are not
actionable without proof of special damage, unless they impute to another the commission of a crime or affect
a person injuriously in his office, profession or occupation. Written or printed words charging dishonesty,
fraud, rascality, or general depravity are generally libelous *per se*, but not so when spoken orally."); *Billington
v. Houston Fire & Cas. Ins. Co.*, 226 S.W.2d 494, 498 (Tex. Civ. App.–Fort Worth 1950, no writ) (quoting
53 C.J.S. LIBEL AND SLANDER § 18, at 63) ("Written or printed words which charge dishonesty or fraud, or
rascality and general depravity, are generally libelous *per se*; but, if spoken orally, ordinarily they are not
slanderous *per se*.").

*Smith Protective Servs., Inc.*, 723 S.W.2d 653, 654–55 (Tex. 1987).  A court determines whether a statement is "reasonably capable of defamatory meaning" by "'constru[ing] the statement as a whole in light of surrounding circumstances based upon how a person of ordinary intelligence would perceive the entire statement.'" *Fiber Systems*, 470 F.3d at 1163 (quoting *Gray*, 941 S.W.2d at 329).  "The surrounding circumstances are the setting in which the alleged slanderous statement is spoken, consisting of the context of the statement and the common meaning attached to the statement.  Common sense requires courts to understand the statement as ordinary men and women would, considering the temper of the times, and the current of contemporary public opinions." *Id.* (quoting *Moore v. Waldrop*, 166 S.W.3d 380, 385–86 (Tex. App.–Waco 2005, no pet.)).  If a statement is ambiguous or capable of innocent and defamatory interpretations, a jury determines how the statement was actually understood by the recipients.  *Id.*

A court may consider the surrounding circumstances to evaluate a statement's defamatory nature without using extrinsic evidence or "innuendo." *Fiber Systems*, 470 F.3d at 1163 n.9 (citing *Moore*, 166 S.W.3d at 385).  "Innuendo is extrinsic evidence used to prove a statement's defamatory nature." *Moore*, 166 S.W.3d at 385 (citing 50 Am. Jur. 2d *Libel and Slander* § 137 (1995)).  "It includes the aid of inducements, colloquialisms, and explanatory circumstances." *Id.*  "[I]f the statement is ambiguous, or if the full effect of the statement cannot be understood without the use of extrinsic evidence, then the trial court must go beyond the snapshot of time in which the statement was published and admit into

consideration inducements and explanatory circumstances." *Id.* at 386. A court may not consider innuendo in determining whether a statement is defamatory *per se* because "[i]f the statement, taken by itself and as a whole, is [defamatory *per se*], it will require no extrinsic evidence to clarify its meaning." *Id.* "If particular language alleged to be defamatory may, or may not, be so, according to other facts or circumstances, then an innuendo is required in order to tender as an issue the fact that the words conveyed to hearers the defamatory meaning." *Billington*, 226 S.W.2d at 496.

Gateway alleges that the written and oral statements made by DGM representatives are either statements that injured Gateway in its business or occupation or that imputed a crime to Gateway or its employees. As noted, the only issue is whether the alleged statements were defamatory *per se* or *per quod*. "[B]efore a plaintiff can recover for defamation *per quod*, the plaintiff must carry his burden of proof on both the existence of and amount of damages. On the other hand, statements that are defamatory *per se* are actionable without proof of injury. Thus, if the alleged statements have been classified as defamatory *per se*, general damages are presumed without requiring specific evidence of harm to the plaintiff's reputation thereby entitling the plaintiff to recover, at a minimum, nominal damages." *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgm't Holdings, Inc.*, 219 S.W.3d 563, 580–581 (Tex. App.–Austin 2007, pet. denied) (internal citations omitted).

**III.  Analysis**

A.      **The Letter From Reeves**[4]

DGM argues that the statements contained in the March 10, 2005 Reeves letter do not

either injure Gateway's business or occupation or impute a crime; that innuendo and extrinsic

evidence are needed to evaluate whether the statements are reasonably capable of the

defamatory meaning alleged; and that there is a genuine dispute as to whether the statements

were true. (Docket Entry No. 48 at 11; Docket Entry No. 51 at 4).

Reeves sent the letter to Gateway with copies to four Tomago employees.  The letter

states that by engaging in a part charter, Gateway: violated Tomago's EA export license;

breached environment and licensing requirements for SPL shipments; falsely represented to

DGM and Tomago that the shipment was a full-charter rather than a part-charter arrangement;

recklessly disregarded the risk to DGM and Tomago by shipping SPL in violation of the

export license provisions; "chose" not to disclose its part-charter arrangement, evidencing that

it "intentionally misled and deceived" DGM and Tomago as to the shipment method; and

knew that a part charter was unlawful and could seriously harm DGM and Tomago, yet

"chose to remain silent" as to the "true nature of its shipping arrangements." (Docket Entry

---

[4]DGM does not argue that Reeves's letter is privileged as a communication from an attorney related to a judicial proceeding.  Texas courts have adopted the rule governing privileged communications by attorneys, as set forth in the RESTATEMENT (SECOND) OF TORTS § 586 (1977).  *See Russell v. Clark,* 620 S.W.2d 865, 869–70 (Tex. Civ. App.–Dallas 1981, writ ref'd n.r.e.); *Hill v. Herald–Post Pub. Co.,* 877 S.W.2d 774, 782 (Tex. App.–El Paso 1994), *rev'd on other grounds,* 891 S.W.2d 638 (Tex. 1994). Under this privilege, an attorney is absolutely privileged to publish defamatory statements concerning another in "communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding."  *Russell,* 620 S.W.2d at 869 (citing RESTATEMENT (SECOND) OF TORTS § 586).

No. 34, ¶ 9; Docket Entry No. 50, Ex. B).  The statements that Gateway acted with reckless disregard for the welfare of its client, knowingly risked subjecting its client to significant legal penalties and the loss of its license, and intentionally lied to its client, are defamatory *per se* because such statements would tend to injure Gateway in its business.

The statements are similar to those that courts have found to be defamatory *per se*.  For example, in *Bradbury v. Scott,* 788 S.W.2d 31 (Tex.App.–Houston [1st Dist.] 1989, writ denied), a corporate majority interest owner wrote two letters about Scott, his coinvestor, after Scott had resigned her employment with the corporation. In both letters, Bradbury accused Scott of lacking fidelity and honesty while she was an employee of their corporation.  The first letter was written to the bank that held the corporation's checking account, and the second was addressed to a charitable organization.  In both letters, Bradbury expressly stated that Scott's actions "could be construed as 'illegal and not in the best interest of the corporation,'" and specifically detailed alleged wrongdoing. *Id*. at 34–35. The appellate court stated that both letters "were libelous *per se* because they accused her [Scott] of conduct that affects a person injuriously in his or her office, profession, or occupation." *Id*. at 38.  In affirming the jury's verdict, the court stated that Bradbury wrote the letter to the bank "knowing that the allegations were not true, but with the apparent intention to recover money from the bank on a banking technicality." *Id*.  In *Shearson Lehman Hutton, Inc. v. Tucker*, 806 S.W.2d 914, 921 (Tex.App.–Corpus Christi 1991, writ dism'd w.o.j.), the court found that statements made by the defendant that Tucker, the plaintiff, was going to lose his

stockbroker's license, was in trouble with the Securities and Exchange Commission, and would never work again as a stockbroker, were defamatory *per se*. *See also*, *Knox v. Taylor*, 992 S.W.2d 40, 51 (Tex. App.–Houston [14 Dist.] 1999, no pet.) (finding that a statement accusing the defendant of bad business practices, including recklessness, and causing a client substantial financial losses was defamatory *per se*); *Tatum v. Liner*, 749 S.W.2d 251, 258 (Tex. App.–San Antonio 1988, no writ) ("Statements that appellee had trouble on the job because of her absences and that appellee made misrepresentations in order to get a higher salary clearly, on their face, relate to appellee's profession.").[5]  As in these cases, innuendo is not needed to show that the statements in the letter are reasonably capable of the defamatory meaning Gateway alleges.  The statements unambiguously and explicitly state that Gateway acted with reckless disregard for Tomago's welfare, risked subjecting Tomago to legal penalties, and intentionally misled and deceived Tomago.

---

[5] *See generally* DAVID A. ELDER, DEFAMATION: A LAWYER'S GUIDE, § 1:11 (2007) ("The traditional tender regard of the common law for the reputations of businesses and businesspersons of all kinds is reflected in the libel cases.").  The cases collected include those in which it was held actionable to state that a restaurant was rat-infested, *Bandido's, Inc. v. Journal Gazette Co., Inc.*, 575 N.E.2d 324, 325–28 (Ind. Ct. App. 3d Dist. 1991); that a merchant "continually harass[ed]" unions, *Caruso v. Local Union No. 690*, 730 P.2d 1299, 1304 (Wash. 1987); that a campaign "opposition research" consultant was "an unscrupulous hired hand with an unsavory history," *Norris v. Bangor Pub. Co.*, 53 F. Supp. 2d 495, 506 (D. Me. 1999); that an art collector–vendor "muddled" provenances "rendering anything he says . . . suspect," *McNally v. Yarnall*, 764 F. Supp. 838, 850 (S.D.N.Y. 1991); that a food supplier produced an unhealthy product, *Modern Prods., Inc. v. Schwartz*, 734 F. Supp. 362, 363 (E.D. Wis. 1990); that an underwriting management company violated an agreement with defendant and wrote unauthorized risks, *Equinox Mgmt. Group v. Guardian Life Ins.*, 813 N.Y.S. 2d 403, 404 (N.Y. App. Div. 2006); that an air travel operator engaged in questionable business dealings with the White House Travel Office, *Caudle v. Thomason*, 942 F. Supp. 635, 639 (D.D.C. 1996); that a vendor of meat engaged in "totally deceptive and misleading" advertising, *Steaks Unlimited, Inc. v. Deaner*, 468 F. Supp. 779, 783 (W.D. Pa. 1979), *aff'd*, 623 F.2d 264 (3d Cir. 1980); that a court reporter engaged in misconduct, unfitness, dishonesty or fraud, "chang[ed]" transcripts, or refused to pay "agreed upon rates," *Yesner v. Spinner*, 765 F. Supp. 48, 51–53 (E.D.N.Y. 1991); or that an employee defrauded her employer by use of a corporate credit card for private purposes, *Meloff v. N. Y. Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001).

DGM asserts that there is a genuine dispute as to the veracity of the statements, making a finding that they are defamatory *per se* improper.  Because Gateway is not a public figure, truth is an affirmative defense.  *See Hearst*, 159 S.W.3d at 637 n.1 (citations omitted); *Randall's Food Mkts.*, 891 S.W.2d at 646 (citations omitted).  Whether a statement is reasonably capable of the defamatory meaning alleged is distinct from whether it is false.  *See Einhorn v. LaChance*, 823 S.W.2d 405, 410–11; *Randall's Food Mkts.*, 891 S.W.2d at 646.  The parties have moved for partial summary judgment solely on the issue of whether the alleged statements are defamatory *per se*, not whether the statements are true.

Gateway's motion for partial summary judgment is granted as to the statements in the letter and DGM's cross-motion is denied.

### B.      The Emails

#### 1.      *The March 5, 2005 Email from Mallard at DGM to St. Ledger at DGM, copied to Tomago Employees*

Gateway asserts that Mallard's statements that Gateway "must have always covertly intended to arrange this as a part charter and find other cargoes in collusion with BBC," that "presumably Gateway must have some sort of cashback arrangement with BBC in place to cover the possibility of ever being asked to prove that they paid the 1.05M to BBC," and that Mallard "firmly believe[d] Gateway never intended to mention the ship was going to take on other cargo until the actual moment someone noticed it heading for the K2 wharf" and "no doubt intended to feign surprise and apportion all blame to BBC" were defamatory *per se*. (Docket Entry No. 50 at 4–7).  DGM argues that these allegations represent opinions, not

defamatory statements of fact, and that none fall within the categories of statements that can

be defamatory *per se*.  (Docket Entry No. 48 at 15).

There is no "wholesale defamation exemption for anything that might be labeled

'opinion.'"  *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990).  The expression of an

opinion may be actionable if it "impl[ies] an assertion of objective fact."  *Id.*  The Supreme

Court explained:

> If a speaker says, "In my opinion John Jones is a liar," he implies
> a knowledge of facts which lead to the conclusion that Jones told
> an untruth. Even if the speaker states the facts upon which he
> bases his opinion, if those facts are either incorrect or incomplete,
> or if his assessment of them is erroneous, the statement may still
> imply a false assertion of fact. Simply couching such statements
> in terms of opinion does not dispel these implications; and the
> statement, "In my opinion Jones is a liar," can cause as much
> damage to reputation as the statement, "Jones is a liar."

*Id.* at 18–19.  "[W]hether a publication is an actionable statement of fact or a constitutionally

protected expression of opinion" depends on its "verifiability and the context in which [it was]

made."  *Bentley v. Bunton*, 94 S.W.3d 561, 579, 583 (Tex. 2002) (citations omitted)

(interpreting *Milkovich*, 497 U.S. 1).  "A statement is considered to be an opinion when, upon

consideration of 'the entire context in which it was made,' it cannot be objectively verified."

*Morris v. Blanchette*, 181 S.W.3d 422, 424 (Tex. App.–Waco 2005, no pet.) (citing *Bentley*,

94 S.W.3d at 581; *Milkovich*, 497 U.S. at 21–22)).  "Texas case law plainly protects those

communications that are not objectifiably verifiable."  *Burch v. Coca-Cola Co.*, 119 F.3d 305,

325 (5th Cir. 1997).

DGM argues that Mallard's allegations are not actionable because they were phrased so as to make them mere expressions of opinion.  DGM points to the following language in the email as showing that they were expressions of opinion, not assertions of fact: "To the best of my knowledge," "So if the Real cost is ~ 600–700k, presumably," "So, I now suspect," "and wonder what the actual real cost of the last two vessels really was?"  The law is clear that "[s]imply couching . . . statements in terms of opinion does not dispel" implied assertions of fact.  *Milkovich*, 497 U.S. at 19.  Mallard's statements about Gateway rest on implied assertions of fact and are not protected as mere statements of opinion.  Stating that a corporation sought to defraud a client and had a "cashback arrangement" with a third party that it concealed from its client would clearly tend to injure that corporation in its business. *See Knox*, 992 S.W.2d at 51; *Shearson*, 806 S.W.2d at 921; *Bradbury*, 788 S.W.2d at 38–39.

This email is defamatory *per se*.

### 2.    *The March 5, 2005 Email from St. Ledger at DGM to Davies at Tomago*

The statements in this email that Pitcock, Gateway's vice president, "fully intended to land this vessel . . . without any reference to the fact that it was accepting other part cargoes and calling at ports en-route to Italy," and that "our relationship with Pitcock and Gateway has been terminated as a result of this greedy, deceitful, and very stupid plan," are defamatory *per se*.  The statements that Pitcock intentionally violated the terms of Tomago's export license, the regulations for shipping SPL, and the parties' joint venture agreement; did so out of "greed"; and concealed the nature of the planned shipment, would clearly tend to injure

Pitcock and Gateway in their business.  *See Knox*, 992 S.W.2d at 51; *Shearson*, 806 S.W.2d at 921; *Bradbury*, 788 S.W.2d at 38–39.  The statements that Gateway and Pitcock did not inform Tomago about whether the vessel was accepting other cargoes and calling at ports en-route to Italy are objectively verifiable and are not protected as mere statements of opinion.  *See Morris*, 181 S.W.3d at 424.  Although "greedy," "deceitful," and "very stupid plan" by themselves may be general disparagements and not defamatory *per se*, these words were used in a context that tied them to specific allegedly dishonest acts.  The statement as a whole is defamatory *per se*.  *See DeWald v. Home Depot*, No. 05-98-00013-CV, 2000 WL 1207124, at *4 (Tex. App.–Dallas Aug. 25, 2000); *Bennett v. Computer Assocs. Int'l, Inc.*, 932 S.W.2d 197, 200 (Tex. App.–Amarillo 1996, writ denied).

This email is defamatory *per se*.

### 3. *The March 5, 2005 Email from Mallard at DGM to St. Ledger at DGM, copied to Davies at Tomago*

DGM asserts that the statements that "[p]resumably, [Pitcock] knows the vessel is in fact in S.E. Asia and intended to try and screw Tomago out of even more cash to have the vessel arrive when it would have anyway!", "in my opinion Mr. Pitcock has taken the art of lies & deception to a level almost beyond belief," "[p]erhaps [Pitcock] has developed a taste for a little Colombian marching powder and has lost his mind?," and the reference to Pitcock as  "the 'smiling assassin,'" do not fall within one of the categories to establish defamation *per se*,  and are statements of opinion.

Stating that a corporation's representative had intentionally lied to a client to enrich the corporation would tend to injure that corporation in its business. Although the reference to "Colombian marching powder" appears to be more a way of describing what was viewed as the outrageous nature of Pitcock's conduct, rather than an allegation of criminal activity, taken as a whole the statement is defamatory *per se* because it is clearly damaging to Gateway's business. *See Knox*, 992 S.W.2d at 51; *Shearson*, 806 S.W.2d at 921; *Bradbury*, 788 S.W.2d at 38–39.

This email is defamatory *per se*.

### C.     The Oral Statements by St. Ledger

#### 1.     The "Lying, Cheating Con-Man from Texas" Statement

Gateway argues that St. Ledger's statement to Peter Hall, a Tomago employee, and Sally Doney, a third party, in Pitcock's presence, that Pitcock was a "lying, cheating con-man from Texas" was defamatory *per se*. (Docket Entry No. 50 at 10–12). DGM asserts that the words "lying," "cheating," and "con-man" are not defamatory *per se* because innuendo is required to show that the statements are capable of a defamatory meaning. (Docket Entry No. 48 at 11–13; Docket Entry No. 51 at 5–7). DGM cites *Moore v. Waldrop*, 166 S.W.3d 380, and *Billington v. Houston Fire & Casualty Insurance Co.*, 226 S.W.2d 494, as support for its assertion that the statements are not defamatory *per se*.

In *Moore*, the defendant told the plaintiff's employer, "You don't want to hire him, he's a crook." 166 S.W.3d at 383. The court found that, taken by itself, the statement was not

24

defamatory *per se* because "[s]tanding alone, the word "crook" is a general disparagement"
that does not impute a "specific crime or moral turpitude" or injure a person's reputation.  *Id.*
at 386 (citing *Billington*, 226 S.W.2d at 496).  The court found that  the statement amounted
to "mere 'name calling'" that "may . . . be slander *per quod* when innuendo and extrinsic
evidence are considered."  *Id.*

Billington* involved a dispute between an insurance agent and insurance company over
unpaid premiums.  226 S.W.2d 494.  The court found that the following statement by a
representative of the insurance company was not slanderous *per se*:

> You're a liar and a thief and a crook.  You've got our money and
> you won't pay us.  You are not worthy to wear that ring (pointing
> to a Masonic ring worn by appellant).  I am a Mason.  I am going
> to have that ring taken off of you and I am going to run you out
> of the Masonic Lodge.  Furthermore, I am going to ruin you and
> hurt you every way in the world I can – I am going to put you out
> of business and I am going to have a letter on the way to Austin
> tonight that will do that.

*Id.* at 495.  The court found that "[t]he words 'liar' and 'crook' were opprobrious, but did not,
in the absence of innuendo, impute the commission of a crime. . . . Nor were the words, taken
by themselves and without explanation, such as would tend to affect appellant injuriously in
his office, profession, or occupation."  *Id.* at 496.  Similarly, the court in *Arant v. Jaffe*, 436
S.W.2d 169, 176 (Tex. Civ. App.–Dallas 1968, no writ), found that the defendant's statement
to a woman holding a yard sale on the defendant's property that "you are a phony, cheat and
a crook and I want you off my property by midnight tonight" was not actionable *per se*.

Under these cases, the words "liar," "cheat," "crook" by themselves are not defamatory

*per se*.  But Texas case law also "firmly establishes that falsely accusing someone of stealing or calling someone a 'thief' constitutes defamation *per se*. . . . [and] when the word 'crook' is used in a context imputing theft, it is also defamatory *per se*."  *Fiber Systems*, 470 F.3d at 1162 (citing *Bennett*, 932 S.W.2d at 200).  In *Bennett v. Computer Associates International, Inc.*, 932 S.W.2d at 200,  the court held that "calling someone a 'crook'" was defamatory *per se* when the defendant had called the plaintiff "a 'thief' and a 'crook' who had stolen . . . computer software."  *See also DeWald*, 2000 WL 1207124, at *4 (finding that a statement that the plaintiff "'took more firewood than he paid for' was slanderous *per se* because even though he did not use the words stole or theft or thief or crook, the clear implication of his statement was that [the plaintiff] had committed a criminal offense in taking more firewood than he paid for," and that notations in the plaintiff's written notice of termination stating that he had been terminated for fraud and theft were libelous *per se*).

In this case, St. Ledger's statement that Pitcock was a "lying, cheating con-man from Texas," made in the presence of Peter Hall of Tomago, is not defamatory *per se*, considering only the statement, the setting in which it was spoken, and the common meaning that the average reasonable person would attach to it.  Innuendo is required to link these general statements to the specific accusations that were raised in the email exchange accusing Gateway of arranging to ship Tomago's SPL in a part charter that would violate Tomago's export license and the joint venture contract, while charging Tomago the higher cost of the full charter and paying the shipper some of the difference in a "cashback arrangement.

26

Because it is necessary to consider innuendo and extrinsic evidence to determine whether the words St. Ledger used were merely name-calling or were defamatory, the statement requires a court to move beyond the analysis of defamation *per se* to defamation *per quod*. *Moore*, 166 S.W.3d at 387.

Gateway's motion is denied as to these statements and DGM's is granted.

### 2.    The "Crooks" and "Very Good Con Men" Statement

Gateway also alleged that in a telephone call from St. Ledger to Diane Shults at Gateway's offices in Houston, St. Ledger said that her bosses, Pitcock and Smith, were "crooks" and "very good con-men" who had "totally screwed DGM" with respect to the SPL shipment on the *Marlene Green*.  Calling someone a "liar" or a "cheat" is generally not by itself   defamatory *per se*.  *See Moore*, 166 S.W.3d at 383; *Arant*, 436 S.W.2d at 176; *Billington*, 226 S.W.2d at 496.  Neither the statement nor the surrounding circumstances tied the labels "crook" or "con-men" to specific acts that are either criminal or dishonest business practices.  Innuendo is required to establish that St. Ledger's statements in this telephone call were defamatory.

Gateway's motion is denied as to these statements and DGM's is granted.

## VI.   Conclusion

DGM's motion for partial summary judgment on the issue of *per se* defamation is granted with respect to the alleged oral statements but denied with respect to the letter and the

emails.[6] Gateway's cross-motion for partial summary judgment is granted with respect to the letter and emails but denied with respect to the oral statements.

SIGNED on April 25, 2008, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge

---

[6] DGM also moved for summary judgment that the following passage in Gateway's complaint failed to allege a statement that was defamatory *per se*: "DGM went to Tomago and informed its employees and/or representatives that Gateway intended to allow the loading of non-SPL cargo on the M/V MARLENE GREEN, and that the March 18 Shipment would not be a non-stop shipment, thereby jeopardizing Tomago's export license and subjecting Tomago to severe penalties from the Australian Government.  DGM's statements were false." (Docket Entry No. 34, ¶ 8; Docket Entry No. 48 at 9).  This passage summarizes the statements made in the letter and emails.  It is not an independent allegation that any defamatory statements were made.  (Docket Entry No. 50 at 9).